DECISION AND JUDGMENT ENTRY
This appeal comes to us from a summary judgment issued by the Lucas County Court of Common Pleas in favor of the defendants in an interference with contract action. Because we conclude that the trial court properly granted summary judgment, we affirm.
In 1994, appellant, Dr. Reda El-Shiekh, began a cardiovascular fellowship with the Medical College of Ohio ("MCO"). This occurred because Defiance Clinic and MCO entered into an agreement whereby Defiance Clinic agreed to fund part of appellant's fellowship conditioned upon his agreeing to become the clinic's full-time cardiologist upon completion of his three-year training. Prior to the agreement between MCO and Defiance Clinic, Northwest Ohio Cardiology Consultants ("NWOCC") also sought to provide cardiac services to the clinic. However, according to the clinic's CEO, Chad Peter, once Defiance Clinic entered into the agreement for services and the fellowship program with MCO, NWOCC ceased its solicitation for cardiology services with the clinic. Roger A. Miller, then a physician with NWOCC, initially co-directed the fellowship program with Theodore Fraker, a doctor with MCO. Fellowship participants were scheduled to do cardiology training rotations at both MCO and Toledo Hospital.
Appellant completed his first rotation in the fall of 1994 working under the supervision of cardiologists at MCO. In January and February 1995, appellee completed a rotation at Toledo Hospital, under the supervision of NWOCC.
In late February or early March 1995, at a regularly scheduled NWOCC meeting, several doctors expressed serious concerns about appellant's performance during his rotation at Toledo Hospital. It was decided that these doctors were to submit letters on this matter to Dr. Fraker. By this time, Dr. James F. Bingle had taken the position of co-director of the joint fellowship program, as Dr. Miller was seeking retirement.
In a letter to Dr. Fraker dated March 13, 1995, Dr. Bingle stated,
 "As I had discussed with you by phone, a number of physicians in our group have expressed grave concerns about [appellant's] ability to function as a first year fellow in our cardiology program. A number of their concerns will be outlined in the letters enclosed.
 "It is my feeling that we should get together to assess his overall status in the program, particularly as the first year nears a close, addressing the question as to whether he is qualified or not to continue."
Three letters from Dr. John L. Schwartz, Dr. Todd L. Monroe, and Dr. John R. Letcher were enclosed with Bingle's letter.
Also in late February or early March, Dr. Miller went to Defiance Clinic on behalf of Toledo Area Health Partners Ltd. ("TAHP"), a group of physicians attempting to establish a new health insurance program. In the course of his conversations at the clinic, Dr. Miller spoke with Chad Peter about appellant. Dr. Miller stated that appellant had received "some bad reviews" from some of the NWOCC doctors. Nothing more specific was said.
In a letter dated April 4, 1995 to Dr. Allen Gaspar at the Defiance Clinic, Dr. Fraker acknowledged the receipt of the NWOCC letters on March 23, 1995 and enclosed copies of them. In that letter, Dr. Fraker suggested that while appellant demonstrated some difficulties, he was showing steady improvement, but his clinical abilities were not inadequate. Nevertheless, Dr. Fraker then went on to state that, while MCO still hoped to find a cardiologist for the clinic as part of the mutually beneficial arrangement, he was leaving it to Defiance Clinic to decide for itself whether, based upon the NWOCC concerns, appellant would be the right person for the position.
Apparently (as it is unclear from the record), just prior to sending his letter to Defiance Clinic, Dr. Fraker and appellant met to discuss the letters and allow appellant to respond. In a letter to Dr. Fraker dated April 7, 1995, appellant referenced the previous meeting and expressed his surprise at the opinions of the NWOCC doctors, noting that evaluations from MCO faculty had been very good. Appellant denied that he had ever exhibited incompetence and gave possible alternative explanations for the negative comments which, in his opinion, were inconsistent with the positive feedback he had received during the Toledo Hospital rotation. Appellant suggested that the NWOCC doctors' letters were financially motivated due to their rejected offer to provide a cardiologist to Defiance Clinic. Appellant then stated that he preferred not to do future rotations at Toledo Hospital, "where evaluations may be motivated by some biased physicians who will incur financial losses when I finish my cardiology fellowship and join the Defiance Clinic."
On June 28, 1995, Dr. Gaspar, by letter, informed appellant that Defiance Clinic was releasing appellant from his contract. Dr. Gaspar stated that "[i]t has been our policy in recruiting physicians that any feeling of discomfort is sufficient reason to continue to looking [sic] at other options. We hope you can realize that this is not in any way a personal value judgment."
Despite the termination of his Defiance Clinic contract, appellant was permitted to finish his three-year fellowship. He received several employment offers, and in January 1998, accepted a position as a cardiologist at the Green River Heart Institute in Owensboro, Kentucky.
In August 1997, appellant filed suit against NWOCC, with Dr. Miller as its statutory agent, Dr. Bingle, Dr. Monroe, Dr. Schwartz, and Dr. Letcher. Appellant alleged claims of tortious interference with a contract, civil conspiracy, and defamation.
Appellee Dr. Miller moved to dismiss the suit based upon a one year statute of limitations for defamation. The court denied the motion, noting that the underlying claim, tortious interference with a contract, has a four-year limitations period.
Appellees Dr. Miller and NWOCC then moved for summary judgment. After considering the depositions of Chad Peter, Dr. Fraker, Dr. Miller, and appellant, as well as additional affidavits from the NWOCC doctors, the trial court concluded that Dr. Miller's statements to Chad Peter were true, constituting a complete defense to the defamation action upon which the tortious interference with a contract claim was based. The court also determined that the letters submitted by the NWOCC physicians were opinions and were, thus, constitutionally protected as being absolutely privileged communications. The trial court then granted summary judgment in favor of appellees as to all of appellant's claims, including civil conspiracy since it, too, was based upon interference with a contract.
Appellant now appeals that judgment, setting forth the following five assignments of error:
 "I. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH BY FAILING TO CONSTRUE A KEY FACT/INTERFERENCE IN FAVOR OF APPELLANT EL-SHIEKH.
 "II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH WHEN IT IMPROPERLY LIMITED ALL ACTS OF INTERFERENCE BY APPELLEES SOLELY TO CONTENT OF APPELLEE MILLER'S STATEMENT TO THE DEFIANCE CLINIC AND THE CONTENT OF APPELLEES' LETTERS TO THE MEDICAL COLLEGE OF OHIO.
 "III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH WHEN IT GRANTED APPELLEES' MOTIONS FOR SUMMARY JUDGMENT AS THE DEFAMATION DEFENSES OF TRUTH AND ABSOLUTE PRIVILEGE DO NOT APPLY TO OHIO TORTIOUS INTERFERENCE WITH CONTRACT CLAIMS.
 "IV. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH BECAUSE EVEN IF TRUTH IS COMPLETE DEFENSE, THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER APPELLEE MILLER MADE A TRUE STATEMENT OF FACT.
 "V. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT EL-SHIEKH BECAUSE EVEN IF ABSOLUTE PRIVILEGE IS A COMPLETE DEFENSE, THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER APPELLEES' INTERFERENCE CONSTITUTED FALSE STATEMENTS OF FACT AS OPPOSED TO CONSTITUTIONALLY PROTECTED OPINIONS."
Appellant's assignments of error essentially contest the validity of the trial court's grant of summary judgment. The standard of review of a grant or denial of summary judgment is the same for both a trial court and an appellate court. Lorain Natl.Bank v. Saratoga Apts (1989), 61 Ohio App.3d 127, 129.
Summary judgment is controlled by Civ.R. 56(C), which states in pertinent part:
 "Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact and, construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C).
The moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. Dresher v. Burt (1996), 75 Ohio St.3d 280, 294-295, citing to Celotex Corp. v. Catrett (1986), 477 U.S. 317.
However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. Dresher, supra; Mitseff v. Wheeler
(1988), 38 Ohio St.3d 112, 114-115.
 I.
Appellant, in his first assignment of error, claims that the trial court failed to construe a key fact in favor of his tortious interference with a contract claim. Specifically, appellant maintains that the trial court was required to infer from the evidence presented that appellees wrote letters after Dr. Miller's comment to Chad Peter and that their motivation for such comment and letters was a desire to provide cardiology services to Defiance Clinic.
A party opposing a motion for summary judgment is entitled to have all admissible evidence construed most favorably in his behalf. William v. First United Church of(1974), 37 Ohio St.2d 150,152. However, the nonmovant may not rely upon the mere allegations or denial in the pleadings, but must set forth specific facts showing there is a genuine issue for trial.Dresher, supra; Mitseff v. Wheeler (1988), 38 Ohio St.3d 112,114-115. Thus, if the party opposing a motion for summary judgment can show, through affidavits, depositions, or otherwise, being construed most strongly in his favor, that he has presented a genuine issue of a material fact about which reasonable minds could differ, that party is entitled to have the motion for summary judgment denied. Harless v. Willis Day Warehousing Co.
(1978), 54 Ohio St.2d 64, 66.
In this case, appellees submitted affidavits stating that, after the meeting of the NWOCC doctors, Dr. Miller commented to Chad Peter that appellant had received "some bad reviews." Dr. Miller gave no further details. Contrary to appellant's argument, Dr. Fraker could not remember whether he heard from Chad Peter or Dr. Bingle first. In response, appellant offers only his own speculation that Dr. Miller's motivation for making the comment was to get Defiance Clinic's cardiology business. However, we can find nothing in the record to support this "inference."
The record shows that the events involving the NWOCC doctors discussion of appellant at their meeting, the doctors' evaluation letters, Dr. Miller's presentation and comment at the clinic, the call to Dr. Fraker, and Dr. Fraker's letter to Defiance Clinic all occurred within a very short time frame. Even if we presume that Dr. Miller's comment was made prior to the sending of the doctors' letters, appellant has produced nothing to show that this comment was improperly motivated or not based upon verbal "bad reviews." In addition, Chad Peter testified in deposition that after Defiance contracted with MCO for a cardiologist, NWOCC made no further efforts to have the clinic utilize its services. In our view, any inferences must be based upon facts presented, not on mere speculation. Therefore, appellant failed to present some factual evidence to show appellees' improper motives or actions and the trial court properly construed the evidence presented.
Accordingly, appellant's first assignment of error is not well-taken.
 II.
Appellant, in his second assignment of error, claims that the trial court erred in limiting the bases for his claim for tortious interference with a contract to certain actions, i.e., Dr. Miller's statement to the clinic and the NWOCC doctors' letters.
A claim for tortious interference with contract is comprised of the following elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification and (5) resulting damages." Kenty v.Transamerica Premium Ins. Co. (1995), 72 Ohio St.3d 415, paragraph two of the syllabus.
In this case, appellant contends that, in addition to the statements made by Dr. Miller and the NWOCC physicians, the "actions" of appellees should be considered as separate bases for tortious interference, i.e, Dr. Miller's contact with the Defiance Clinic "for illicit purposes and financial gain" and the NWOCC doctors' meeting at which it was agreed that letters would be written by the doctors who had experienced unsatisfactory performance by appellant.
We agree with the trial court that appellant's underlying claim for his tortious interference claim is that the NWOCC doctors and Dr. Miller, by their statements, caused Defiance Clinic to terminate appellant's contract. In our view, facts about the alleged contact and meeting were offered simply to establish the motive for the statements. Therefore, these "actions" are not separate causes of action, but simply factual evidence to be considered in determining whether or not appellant has met his summary judgment burden.
Upon a complete reading of the record, nothing indicates that Dr. Miller's contact with the Defiance Clinic was for anything other than to present the health insurance proposal. Likewise, other than appellant's speculation or opinion, we can find no factual evidence to indicate the NWOCC physicians' meeting itself was anything but a routine activity. Appellant argues that, because the physicians did not use the regular evaluation forms to communicate their concerns, this demonstrates some improper motivation. However, nothing in the record establishes that MCO did not accept or that there was anything improper about the use of such letters in lieu of a formal evaluation procedure. Therefore, the trial court did not err in its determination that the only actions which actually support appellant's claim are Dr. Miller's statement to the clinic and the NWOCC physician letters.
Accordingly, appellant's second assignment of error is not well-taken.
 III.
We will address appellant's third and fourth assignments of error together. Appellant, in his third assignment of error, argues that truth or privilege for opinions are not defenses to a claim of tortious interference. Appellant, in his fourth assignment of error, states that even if such defenses are permitted, there remain genuine issues of material fact as to whether appellees' statements were truthful or protected opinions.
In A B-Abell Elevator Co., Inc. v. Columbus/CentralOhio Bldg. Constr. Trades Council (1995), 73 Ohio St.3d 1, 15, the Supreme Court of Ohio held that "where claims such as tortious interference and disparagement are based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements under Jacobs [v. Frank (1991), 60 Ohio St.3d 111], at paragraph two of the syllabus, must also apply in the derivative claims." Privileged statements may be those which are made to protect some kind of public interest, such as ensuring the quality of health care administered to the general public. A B-Abell, supra, at 9; Jacobs, supra, at paragraph one of the syllabus. In order to succeed on a tortious interference claim, a plaintiff must demonstrate clear and convincing evidence that the privileged communication was made with actual malice, that is, with knowledge that the statements are false or with reckless disregard as to their truth or falsity. A B-Abell, supra, at 9.
Applying the Jacobs rationale, truthful statements, where not confidential, would be a complete defense to tortious interference where the underlying claim is based upon allegations of defamatory statements. See id. Likewise, opinions, statements which can be proven neither true nor false, would also be a defense. See Vail v. The Plain Dealer Publishing Co. (1995),72 Ohio St.3d 279.
In this case, since Dr. Miller was a member of the group of doctors which was, in fact, supervising some of appellant's training, his interest in protecting public health was sufficient to warrant communication as to appellant's progress. Nothing in the record indicates that any of the information disseminated was confidential or that appellees breached any duty of confidentiality. Therefore, regardless of whether it referred to verbal or written evaluations, Dr. Miller's statement to Chad Peter that appellant had received "some bad reviews," was both privileged and true. Appellant has suggested, but offered no proof that Dr. Miller lied and then attempted a "cover up" by having the doctors write letters to substantiate his statement. Therefore, since appellant did not establish that Dr. Miller's statement was either false or made with actual malice, it fails to establish a claim for tortious interference.
For the same reasons, the NWOCC physicians who were in charge of appellant's training at Toledo Hospital were certainly entitled, in the interest of public health and safety, to express concerns or dissatisfaction with appellant's performance. While appellant may have disagreed with the observations made by the NWOCC physicians or the manner of their evaluation, no evidence was presented that these letters were based upon false allegations or made with actual malice. In fact, appellant acknowledged in deposition that the letters sent to Dr. Fraker and forwarded to the clinic included only subjective opinions regarding his performance.
In our view, the physician letters were opinion and were protected as privileged. Since appellant has not presented any evidence that the NWOCC physicians acted with actual malice, he cannot establish the elements required for a claim of tortious interference with a contract. Consequently, the trial court did not err in ruling that appellees' statements were an absolute defense to appellant's claim for tortious interference with a contractual relationship. Therefore, we conclude that, since no genuine issues of material fact exist and appellees are entitled to judgment as a matter of law, the trial court did not err in granting summary judgment as to appellant's claim for tortious interference with a contractual relationship.
Accordingly, appellant's third and fourth assignments of error are not well-taken.
 IV.
Appellant, in his fifth assignment of error, contends that the trial court erred in dismissing his civil conspiracy claim.
A civil conspiracy claim cannot succeed without an underlying unlawful act. Williams v. Aetna Fin. Co. (1998),83 Ohio St.3d 464, 475. Where all the substantive causes of action on which a conspiracy claim is based are without merit, a conspiracy claim must also fail. See Minarik v. Nagy (1963),8 Ohio App.2d 194, 195.
In this case, since we have determined that the underlying substantive causes of action for tortious interference are without merit, appellant's civil conspiracy claim also fails.
Accordingly, appellant's fifth assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
 ______________________ SHERCK, J.
 Peter M. Handwork, J., James R. Sherck, J., George M. Glasser, J., JUDGES CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.